

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | CRIMINAL ACTION |
| v. | | |
| AKINTUNDE CRAWFORD | | NO. 06-377 |

SURRICK, J.　　　　　　　　　　　　　　　　　　　　　　　　　　JUNE /*f*, 2008

### MEMORANDUM & ORDER

Presently before the Court is Defendant Akintunde Crawford's Motion for Judgment of Acquittal Pursuant to Rule 29(c)(1), (Doc. Nos. 197, 198). For the following reasons, Defendant's Motion will be denied.

**I.　BACKGROUND**

On July 26, 2006, the grand jury returned an indictment charging Defendant Akintunde Crawford (hereinafter "Defendant") with conspiracy to commit bank fraud and identity theft in violation of 18 U.S.C. § 371 (Count 1); bank fraud in violation of 18 U.S.C. § 1344 (Counts 3-5); and aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts 13, 16, 18-22). (Doc. No. 1.) On September 7, 2007, the jury returned a verdict of guilty against Defendant on all Counts. Defendant now seeks relief pursuant to Federal Rule of Criminal Procedure 29, asserting that the evidence presented at trial was insufficient to establish his guilt.

**II.　LEGAL STANDARD**

Federal Rule of Criminal Procedure 29(a) provides, in pertinent part: "The court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CIV. P. 29(a). The "sole foundation upon which a

ENTERED
JUN 19 2008
CLERK OF COURT

judgment of acquittal should be based is a successful challenge to the sufficiency of the government's evidence." *United States v. Frumento*, 426 F. Supp. 797, 802 n.5 (E.D. Pa. 1976), *quoted in United States v. Carter*, 966 F. Supp. 336, 340 (E.D. Pa. 1997); *see also* 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 466 (3d ed. 2000) ("There is only one ground for a motion for a judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information." (internal quotation marks omitted)). In considering a post-verdict motion for judgment of acquittal, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence must be examined as a whole in the light most favorable to the jury verdict, with the presumption that the jury properly evaluated the credibility of witnesses, found the facts, and drew rational inferences. *See United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005); *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992). Moreover, the verdict of the jury must be upheld unless, viewing the evidence in this fashion, no rational jury could have found the defendant guilty beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984); *see also United States v. Stratton*, Crim. A. No. 99-326, 2000 WL 892840, at *3 (E.D. Pa. July 6, 2000) (quoting *United States v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987) (finding that a court must sustain the verdict unless "'no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'") (citation omitted)). We must "examine the totality of the evidence, both direct and circumstantial." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003). "The evidence

2

need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990).

"The elements of conspiracy – i.e., 'an agreement either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense' – can be proven entirely by circumstantial evidence." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)). "Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *Brodie*, 403 F.3d at 134. Nevertheless, each element of the offense of conspiracy must be proved beyond a reasonable doubt. *United States v. Cartwright*, 359 F.3d 281, 286 (3d Cir. 2004); *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

To find a co-conspirator guilty of a substantive offense committed by a co-conspirator, "a jury must find that a party to the conspiracy committed a crime both 'in furtherance of' *and* 'as a foreseeable consequence of' the conspiracy . . . ."[1] *United States v. Turcks*, 41 F.3d 893, 897 (3d

---

[1] The jury was charged on *Pinkerton* liability in pertinent part as follows:

> [C]ounts Two through 22 of the indictment charge that certain defendants committed bank fraud and aggravated identity theft. The government may prove a defendant guilty of these offenses by proving that a defendant personally committed the offenses. The government may also prove a defendant guilty of these offenses based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by the other members of the conspiracy as long as those crimes and acts were committed to help further or achieve the object or the objectives of the conspiracy, and were reasonably foreseeable to the defendant as a necessary and natural consequence of the agreement. In other words, ladies and gentlemen, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by any

Cir. 1994) (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946); *United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990)).

## II.   LEGAL ANALYSIS

Defendant seeks judgment of acquittal, stating that "the Government has failed to establish the defendant's guilt by sufficient evidence." (Doc. No. 198 ¶ 2.) Defendant contends specifically that "the jury improperly assumed that defendant had an active role in Mr. White's fraud scheme" because of circumstantial evidence presented by the Government. (*Id.* ¶ 2.) Defendant argues that rather than presenting "direct evidence" of Defendant's criminal activities, the Government attempted, but failed, to establish Defendant's guilt through evidence of "the defendant's familial connection to Charles White, a series of phone calls between [them] that may have occurred and items found in the basement, in a box under the steps of Rah's Fashion Boutique on November 8, 2005, five months after the last over [sic] act." (*Id.*)

Initially we observe that the evidence presented at trial of a wide ranging conspiracy to commit bank fraud and identity theft was overwhelming. Moreover, the evidence establishing that Defendant Crawford was a participant in this conspiracy was compelling. A brief review of

---

one or more of them, even though they did not all personally participate in that crime themselves.

. . . .

Ladies and gentlemen, the government does not have to prove that the defendant – that a defendant specifically agreed to or knew that these offenses would be committed. However, the government must prove that the offenses were reasonably foreseeable to the defendant, as a member of the conspiracy, and within the scope of the agreement as the defendant understood it.

(Trial Tr. 9/5/08 at 185-87.)

4

the direct and circumstantial evidence of Defendant's involvement demonstrates the frivolousness of Defendant's argument.

At trial, the parties stipulated that Defendant worked at Rah's Fashion Boutique from July 2004 through October 2005. (Trial Tr. 8/29/07 at 215.) It was also stipulated that in November of 2005 Defendant was frequently at the store. On November 8, 2005, United States Postal Inspector Khary Freeland executed a search warrant at Rah's Fashion Boutique. (Trial Tr. 9/4/07 at 68.) Inspector Freeland was familiar with the location as a result of this investigation. (*Id.* at 67.) Inspector Freeland testified that the ground floor of the store looked like an ordinary clothing store. (*Id.* at 68.) The basement of the store had one room with a weight bench and two other rooms, one of which had a couch and a rug. (*Id.*) During the search of the basement area Inspector Freeland seized substantial evidence of Defendant's involvement in the identity theft conspiracy. (*Id.* at 69, 78.)

On the shelves underneath the stairs to the basement, Inspector Freeland found a box which contained United States mail addressed to Akintunde Crawford at Rah's Fashion Boutique. (*Id.*) Inside of the box and inside of an envelope addressed to Defendant, Inspector Freeland found a number of drivers' licenses and passport photographs of various individuals. (*Id.* at 75; Gov't Exs. 195, 196.) Inspector Freeland also found counterfeit identification cards. (Trial Tr. 9/4/07 at 76; Gov't Ex. 196.) In addition, Freeland found computer disks which held check templates, scans of fake identifications, scans of checks, and scans of individuals' photographs. (Trial Tr. 9/4/07 at 71, 228.) One of the computer disks had an image of a Delaware driver's license with identifying information for one David L. London. (*Id.* at 76; Gov't Ex. 197.) Although the driver's license was in the name of David L. London, the picture

5

on the driver's license was of Defendant Akintunde Crawford. (Trial Tr. 9/4/07 at 127.)

Next to a collection of Defendant's mail, Inspector Freeland found a manual for making identifications entitled "User's Guide, ID Maker, Lexington Technology." (*Id.* at 70, 299; Gov't Ex. 101.) Inspector Freeland also found, among other things, original checks, an original application for a bank account, and correspondence addressed to Oshun Crawford, Defendant's wife. (Trial Tr. 9/4/07 at 70-73.) Among the checks which Inspector Freeland found were checks written to Select Financial, the business which employed co-defendant Michael Merin. (*Id.*) One of the original checks was for the account of an individual by the name of David Ginfrida. (*Id.* at 160.) Written on the check were an account balance and date of birth. (*Id.*; Gov't Ex. 105.) Testimony established that the conspirators' routinely created cheat sheets which contained information such as the latest account balance and date of birth of the targeted account holder, in case the bank teller asked questions concerning personal details. (Trial Tr. 9/4/07 at 161.) Written on the top of the Ginfrida check were the words "Pooch Man." (*Id.*) "Pooch" is Charles White's nickname. The Ginfrida bank account was one of the accounts that had been subjected to fraudulent activity. (*Id.*) Another check found in the basement was Check No. 1204 belonging to one Yamille Powell. (Gov't Ex. 100.) Co-conspirator Terry Hughes fraudulently cashed a Powell check which had the next number in sequence, Check No. 1205, for $1500. (Gov't Ex. 34.) A third check found at Rah's Fashion Boutique was written by Title Associates of Virginia, Inc., and made payable to Weichert Realtors. (Gov't Ex. 194.) Hughes posing as Brian Gundry passed a check purportedly written by Title Associates and made payable to Gundry. (Gov't Ex. 38.) A representative of Wachovia Bank identified the check as counterfeit. (Trial Tr. 8/28/07 at 144.)

An original Application for a business account at Commerce Bank that had been filled out by Kendrick Ellison for Dax Investment Enterprises was seized during the search. (Trial Tr. 9/4/07 at 72; Gov't Ex. 103.) Kendrick Ellison testified that he was a customer at Commerce Bank and suspected fraudulent activities in his account in 2004. (Trial Tr. 8/29/07 at 115, 116) Ellison contacted Commerce Bank and the bank determined that there had in fact been fraudulent activity in the account. (*Id.*) Ellison identified the Application for the business account and confirmed that it was the original document that he had filled out. (*Id.* at 119.) Ellison also testified that he had never been to Rah's Fashion Boutique, did not know Defendant Crawford, and did not know of any reason why his Application would be in the basement of Defendant's store. (*Id.* at 120.)

Co-conspirator Hughes entered into a cooperation plea agreement with the Government and testified against his co-defendants. Hughes testified that he met Defendant Crawford after co-defendant and ringleader Charles White told him that he would need nice clothes and fake identification in order to actually go into the banks to cash checks. (Trial Tr. 8/28/07 at 260-62, 265-66.) White sent Hughes to Defendant's store, Rah's Fashion Boutique, to get the clothes. (*Id.* at 265-66.) Hughes did not buy the clothes, rather, Defendant gave Hughes the new clothes for nothing. (*Id.*) Photographs identified at trial, (Gov't Exs. 35, 37, 39, 41, 43), showed Hughes wearing the clothing from Rah's Fashion Boutique while standing in the various banks during the fraudulent check-cashing transactions. (Trial Tr. 8/28/07 at 266-69.) Hughes testified that he had a passport photo taken which he gave to White for the purpose of making false identification. (*Id.* at 261.) Defendant Crawford was present when White subsequently gave the false identification to Hughes. (*Id.*) Hughes used this false identification to cash fraudulent

checks. (*Id.* at 263-64.) Hughes positively identified Defendant, indicating that Defendant was known to him as "Raheem." (*Id.* at 262.)

Both before and after cashing checks, Hughes and White would go to Defendant's store. (*Id.* at 272.) Hughes estimated that this occurred approximately ten to fifteen times and that Defendant was present on each occasion. (*Id.*) White and Defendant would speak at the store, and on one occasion Hughes observed Defendant and White splitting up the money. (*Id.* at 272-73.) Hughes testified that he cashed fraudulent checks in the total amount of approximately $50,000 while he was involved with this identity theft ring. (*Id.* at 277-78.) From this amount, Hughes kept five-percent and the rest went to White, Defendant, co-defendant Antoine Norman, and others. (*Id.* at 278.)

Kelly Taylor was a runner who also cashed checks for this identity theft ring. Taylor entered into a plea agreement with the Government and testified against her co-conspirators. Taylor identified Defendant at trial as a person involved in the scheme to defraud banks and commit identity theft in 2004 and 2005. (Trial Tr. 8/29/07 at 153, 160, 163.) Defendant was known to Taylor as "Raheem." (*Id.* at 603.) Taylor estimated that during her career with this identity theft ring she cashed approximately $500,000 to $1 million worth of fraudulent checks. (*Id.* at 174.) Taylor introduced United States Postal Inspector Yvette Thomas to White and other members of this conspiracy.

Postal Inspector Thomas testified that she went undercover to assist in the federal investigation of the bank fraud and identity theft ring. (Trial Tr. 8/30/07 at 250.) She posed as an individual named "Karen" and was introduced to the group by Kelly Taylor. (*Id.* at 252.) Inspector Thomas initially met Charles White in a Dunkin' Donuts parking lot. (*Id.* at 255-56.)

She was introduced by Taylor as check-cashing recruit. (*Id.* at 253, 255-56.) After this initial meeting at Dunkin' Donuts, Taylor, White, and Inspector Thomas left the parking lot and went to Rah's Fashion Boutique in separate cars. (*Id.* at 256-57.) Inspector Thomas identified the driver of the car in which White was a passenger as co-defendant Antoine Norman. (*Id.* at 258.) Inspector Thomas observed White get out of his car and go into Rah's Fashion Boutique. (*Id.*) Inspector Thomas then observed White leave Rah's Fashion Boutique and return to his car. (*Id.* at 259.) Inspector Thomas stood outside of White's vehicle while White was seated in the right rear passenger side of the vehicle. (*Id.*) Inspector Thomas observed that White was now holding a Pennsylvania driver's license and another form of identification for an African-American female as well as a photocopy of a check. (*Id.*) White was not carrying these items prior to entering Defendant's store. (*Id.* at 259-60.) White asked Inspector Thomas if she would be interested in cashing checks in person at banks. (*Id.*) Inspector Thomas advised White that she preferred to cash checks through the drive-in bank facilities. (*Id.*) Inspector Thomas and Taylor did in fact cash fraudulent checks that day and the proceeds were distributed between Taylor, Inspector Thomas, White and Norman. (*Id.* at 261-62, 264-70.) When White was talking to Inspector Thomas about joining the conspiracy White, told Inspector Thomas that he had made over $2 million from this identity theft ring. (*Id.* at 273.)

    Kevin Norris was another individual charged in this bank fraud and identity theft conspiracy. Norris entered into a plea agreement with the Government and testified against his co-defendants. Norris testified that he drove White to Rah's Fashion Boutique on several occasions. (Trial Tr. 8/30/07 at 204.) On these occasions Norris observed White speaking with Defendant, who Norris identified as "Raheem." (*Id.* at 205.) White and Defendant would speak

9

together either upstairs or downstairs at the Boutique and sometimes their discussions lasted an hour or two. (*Id.* at 207.) Norris observed White and Defendant arguing at times. (*Id.* at 208.) White told Norris that he and Defendant argued about money. (*Id.* at 209-10.) Sometimes after these meetings Norris and White would go to banks for the purpose of cashing fraudulent checks.[2] (*Id.* at 207-08.)

Finally, Inspector Freeland testified that he identified four telephone numbers associated with Defendant from the group's cell phone records. (Trial Tr. 9/4/07 at 79-80, 86.) The Inspector identified approximately 280 calls between White and Defendant during the time period of January 2005 to November 2005. (*Id.* at 92-93.) There were also 128 calls between Defendant and co-defendant Michael Merin, (*id.* at 97), 47 calls between Defendant and co-defendant Allen Smith, (*id.*), and 5 calls between Defendant and co-defendant Antoine Norman, (*id.* at 94). A number of the calls between Defendant and his co-conspirators took place at or near the times that the identity thefts with which Defendant was charged took place. The cell phone records also confirmed contact between the co-conspirators and the defrauded banks, accessing the bank accounts of customers whose accounts were raided.

We are satisfied that there was more than sufficient evidence to support the jury's conclusion that Defendant was part of this bank fraud and identity theft conspiracy. The Government presented substantial evidence, both direct and circumstantial, demonstrating that Defendant was an active participant in this identity theft and bank fraud conspiracy. Defendant's role was to provide false or counterfeit identifications, counterfeit checks, and clothing to

---

[2] Two additional co-conspirators entered into plea agreements with the Government and testified against their co-defendants at trial. Lisa Smith and Rachel Lukovsky both testified in detail concerning their participation in this identity theft organization.

runners impersonating bank customers.  In return, Defendant was compensated for his contribution to the illegal endeavor.

Accordingly, Defendant's Rule 29 Motion will be denied.

An appropriate Order follows.

*RBS*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | CRIMINAL ACTION |
| v. | | |
| AKINTUNDE CRAWFORD | | NO. 06-377 |

**FILED**

### ORDER

AND NOW, this 18th day of June, 2008, upon consideration of Defendant Akintunde Crawford's Motion for Judgment of Acquittal Pursuant to Rule 29(c)(1), (Doc. Nos. 197, 198), and all papers submitted in support thereof and in opposition thereto, it is ORDERED that the Motion is DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge

ENTERED
JUN 19 2008
CLERK OF COURT

Copied to Edward C. Meehan
Anthony Jyinahakii
David Ipnell

R.S. Mail to A. Crawford 6/19/08

ENTERED
JUN 19 2008
CLERK OF COURT